[Civ. No. 34633.  Second Dist., Div. Three.  Apr. 23, 1970.]

ERNEST C. TIMMSEN et al., Plaintiffs and Appellants, v. FOREST E. OLSON, INC., et al., Defendants and Respondents.

## COUNSEL

Edward L. Lascher for Plaintiffs and Appellants.

Gabler, High & Clark and Jess F. High for Defendants and Respondents.

## OPINION

**SCHWEITZER, J.**—Action for damages for breach of real estate brokers' fiduciary obligation to their principals. Appeal by plaintiffs from judgment of nonsuit after completion of opening statement by plaintiffs' attorney. (Code Civ. Proc., § 581c.) For the purpose of the motion for nonsuit counsel stipulated that the statement of facts set forth in plaintiffs' trial brief would be deemed to be the opening statement of counsel for plaintiffs.

### *The Opening Statement Summarized*

Plaintiffs, husband and wife, owned a residence in Van Nuys. They were in their sixties, and were inexperienced and unsophisticated in business dealings, especially in real estate. On March 18, 1961, Mr. Timmsen went to the office of defendant Forest E. Olson, Inc., a licensed real estate brokerage firm, met defendant Ramser, a licensed real estate broker who was working as a salesman for Olson, and discussed the sale of plaintiffs' home. Ramser prepared a listing agreement, including therein a commitment by the plaintiffs "to subordination" on the sale of their property. Neither the plaintiffs nor Ramser knew the meaning of the term. Ramser understood that the agreement imposed upon him the duty to sell the property, and that he had some fiduciary obligations, namely to be fair to the purchasers and the sellers, and to submit to plaintiffs any offer received.

"It was standard practice for brokers . . . to have a string of builders 'who we work with' and whose favor they curry, since such builders are likely purchasers of such listed property."

Defendant Masters, a salesman for defendant Olson, upon learning of

the listing, immediately contacted Joe Burrow, a builder, and advised him of the listing "since the terms would be so favorable to someone in Burrow's position." Burrow inspected the property, decided to buy it, and made an offer on a deposit receipt form supplied by Masters that he would buy the property for $47,500, $12,500 cash and the balance payable, interest only for the first year, thereafter principal and interest payable at $260 per month until paid; that his purchase money encumbrance would be subordinated to any construction loan or permanent loan placed on the property by Burrow, provided such loan did not exceed $300,000, did not have interest of more than 9 percent and was not payable over a longer period than 30 years; and that the offer was subject to Burrow's getting the property rezoned and his approval of a title report. The deposit receipt form was signed by Burrow and Masters, the latter signing individually and in behalf of Olson. Defendants "exercised no judgment whatsoever concerning the terms inserted by Burrow. Thus, they failed to do anything on behalf of their principals. . . ."

"Instead of thinking about the Burrow proposition from the standpoint of their client, RAMSER and MASTERS merely proceeded to attempt to get the Timmsens to accept the Burrow proposal, going almost at once to the Timmsen house for that purpose. Among other things, the Timmsens raised questions concerning the subordination provisions—the true nature of which MASTERS did not grasp much more than RAMSER did (he thought it had something to do with 'reliance and estoppel'). The Timmsens' doubts concerning subordination were brushed aside by the defendants, who told their clients that since they had signed a listing agreement saying something about subordination they had no choice but to accept the subordination provision of the Burrow offer.

"That Burrow offer was unjust and unfair from the standpoint of the Timmsens for a variety of reasons. Some of them:

"1) While the price of $49,500 (which was eventually reached) would have been fair under other terms without the subordination, it was grossly inadequate with subordination terms of this nature. For a sale involving subordination of this type, a reasonable price would have been at least $70,000.

"2) Even if the price had been reasonable with subordination, this particular subordination agreement would have been unfair because it did not contain minimum guarantees concerning the use of the construction loans for construction purposes and the like (which the Supreme Court of this state has said are essential).

"3) There was no requirement that the loan which Burrow might obtain

would come from a bank or other lending institution, which provide some security to the seller because of the bank's rules and policies.

"4) In view of Timmsen's age and the fact that this was their sole asset, the time for repayment and amount of the loan to which they would subordinate would mean that they were simply gambling their home with no security.

"5) Apart from the subordination provisions, RAMSER felt that there were a number of defects in it which ran in favor of the builder and which, in a sense, made it merely an option in Burrow's favor and not a binding sale at all. He did nothing about these defects, however, because he did not write the offer.

"MASTERS took the position that the fairness or propriety of the subordination agreement was immaterial, since the listing agreement bound the Timmsens to take any subordination deal. (Although MASTERS believes that the selling price was proper on these terms, and that the terms affect the selling price of a parcel of property, he has no idea what price would be reasonable without subordination or under any other terms than those Burrow dictated.)

"When the Timmsens balked at the whole deal, RAMSER and MASTERS talked them into taking all of the same terms except for an increase in the over-all selling price and the payments to the Timmsens, but with no change in the down payment and definitely no change in the subordination provisions. (The monthly payment was hiked to $300 and the total balance to the Timmsens—behind the loans Burrow put on the property—went up to $37,000, cutting down the time it would take the Timmsens to be paid off to a 'mere' nineteen and one-half years.)"

Defendant Masters informed Burrow immediately by telephone of plaintiffs' counteroffer. Burrow stated that it was acceptable and at his request, Masters signed the counterproposal on Burrow's behalf.

"In writing this on the sale document and signing it, MASTERS was committing an illegal act which is prohibited by a California Statute and by a regulation in the California Administrative Code which absolutely forbids anyone with a real estate license to do this. He was also, incidentally, violating the training and supervision of OLSON, which was designed to keep him from doing this. (OLSON, however, has at all times ratified and approved of his activities, despite the violation of OLSON's rules and of the California law, and OLSON is therefore responsible for MASTERS.)"

An escrow was opened. Plaintiffs refused to sign the escrow instructions because of their concern that a move from the property might be dangerous

to the health of Mrs. Timmsen's aged mother. They consulted an attorney. Notwithstanding Masters' statement that it would cost them at least $5,000 if they refused to go through with the sale, plaintiffs refused to sign the escrow documents upon advice of their attorney.

The parties hereto, Burrow and their respective lawyers commenced to negotiate. "The initial thrust of this was designed at reaching a basis on which the sale could be avoided or at least delayed until such time as the grandmother's [sic] health would not be a factor. Throughout these negotiations, . . . [defendants'] representatives strenuously espoused the cause of Burrow as against their clients' desires." Defendants knew that plaintiffs wanted to rescind the sale agreement, that the agreement was not enforceable because it had not been personally signed by Burrow but by Masters in Burrow's behalf, that plaintiffs were unaware of such fact, and that the law imposed on defendants a duty to reveal to plaintiffs the fact of nonsignature by Burrow. Plaintiffs first learned that Burrow had not signed the agreement when his deposition was taken in a specific performance action filed by Burrow against the plaintiffs, "and it was then too late, since the filing of the suit cured the defect in executing the sale documents."

During the negotiations Mrs. Timmsen's mother died, removing this consideration. Nevertheless plaintiffs continued to refuse to perform the agreement because "they were advised that the subordination provisions of the agreement were totally unjust and unfair and rendered the deal extremely hazardous to their security."

Burrow's suit for specific performance resulted in a judgment for plaintiffs herein, was reversed on appeal (*Burrow* v. *Timmsen*, 223 Cal.App.2d 283 [35 Cal.Rptr. 668, 100 A.L.R.2d 544]), and on retrial a decree of specific performance was entered in favor of Burrow. Plaintiffs herein considered an appeal "but by this time they were becoming so worn and nervous over the continued battling and so apprehensive of several more years and maybe a third trial, that they decided to see if they could settle; they found that Burrow was willing to compromise by taking a cash settlement [of $7,500] instead of their home."

Plaintiffs had to borrow the $7,500 to pay Burrow and in connection therewith, had to pay loan costs and interest. They seek to recover from defendants herein these items, the costs and attorney's fees in connection with the two trials and the appeal, and damages for "all sorts of anxieties, nervousness, embarrassment and mental strain."

## Motion for Nonsuit

Defendants' motion for nonsuit was made on the ground that "the open-

ing statement does not state facts sufficient to state a cause of action against any of the defendants, that the plaintiff [*sic*] has not advised the Court in any way as to how he might or could amend the complaint or pretrial statement or statement of facts or opening statement so as to state a cause of action." In answer to plaintiffs' request for specificity, counsel for defendant Masters stated: "I fail to see where there has been any allegation, or failure to use reasonable care in an allegation of negligence, that they failed to use the degree of care which should have been exercised by brokers in the community, an allegation of malpractice. [¶] There is no allegation of fraud, that through their affirmative representations or concealment the plaintiff [*sic*] was induced to act in a certain manner, that the plaintiffs relied upon that, all the elements of fraud, and that therefore they sustained some type of damage." Counsel for the other defendants added: "he has not, in his opening statement, referred to either affirmative, intentional, negligent or acts of omission which would be a violation of a duty upon the part of the real estate broker—either intentional or negligence, . . . . [¶] He has not shown, if the plaintiff [*sic*] was damaged at all, how this proximately resulted from any act or inaction on the part of the defendants. [¶] He has not alleged in his opening statement the duties of the broker that have been specifically violated by the broker."

Plaintiff's counsel was given the opportunity to amend his opening statement to meet any deficiencies; he declined.

The motion for nonsuit was submitted and counsel were later notified that it was granted, the minute order setting forth the grounds as follows: "Plaintiffs are estopped from again litigating the alleged unjustness or unfairness of the contract for the sale of the property, that issue having been decided adversly [*sic*] to them in Burrow Vs. Timmsen, . . . . The words 'I agree to the counter offer. J. B.' do not constitute an 'addition to, deletion from or alteration of' the contract. If Olson was acting for both parties to the transaction, plaintiffs knew it. . . .[1] Only the principal, or a party in privity to the oral agreement, may assert the statute of frauds. . . . The buyer could, at any time, have ratified the act of Masters, in any one of numerous ways and said ratification would have been equivalent to a previous authorization. . . ."

■ A motion for nonsuit upon an opening statement is authorized by section 581c of the Code of Civil Procedure. In connection therewith the court must accept as true all of the facts set forth in the statement, must

---

[1]The minute order made reference to the following sentence in plaintiffs' opening statement: "Masters did, however, sign the Burrow proposal as though he had played a role in connection with it, signing his own name and in behalf of OLSON . . . that Burrow-prepared document was signed 'Forest E. Olson Broker, by C. O. Masters'."

give those facts all the value to which they are legally entitled, and must indulge in every legitimate inference which may be drawn therefrom. A nonsuit is warranted only when the court concludes from such facts and inferences that as a matter of law there will be no evidence of sufficient substantiality to support a judgment in favor of the plaintiff. (*Stephan* v. *Proctor,* 235 Cal.App.2d 228, 231 [45 Cal.Rptr. 124]; *Bocker* v. *Miller,* 213 Cal.App.2d 345, 347 [28 Cal.Rptr. 818]; 2 Witkin, Cal. Procedure (1954) Trial § 125 et seq.)

■ Because of the possible drastic effect of the motion the courts have established rules to protect the plaintiff. In order to alert him to any deficiencies and to give him an opportunity to cure or eliminate them: (1) the motion for nonsuit must state the precise grounds upon which it is made, with the defects in the opening statement clearly and particularly indicated (2 Witkin, Cal. Procedure (1954) Trial § 129); (2) "only the grounds specified [by counsel] should be considered by the lower court in its ruling, or by the appellate court on review" (2 Witkin, *id.* § 130); and (3) "grounds not specified in a motion for nonsuit will be considered by an appellate court only if it is clear that the defect is one which could not have been remedied had it been called to the attention of plaintiff by the motion." (*Lawless* v. *Calaway,* 24 Cal.2d 81, 94 [147 P.2d 604].)

■ Here, notwithstanding repeated requests by plaintiffs' counsel for specificity, defense counsel failed to clearly and precisely state the grounds of their motion. General, uninformative statements, such as "there is an insufficiency of evidence to prove the allegations contained in the complaint," have been held inadequate. (*Markwell* v. *Sykes,* 173 Cal.App.2d 642, 650-652 [343 P.2d 769]; see 2 Witkins, *id.* § 129.) The error was compounded by the court when it granted the motion, according to its minute order, on grounds not specified by counsel. This error, however, was rectified by giving plaintiffs' counsel an opportunity to argue the grounds specified by the trial court at the hearing on the motion for new trial. Since plaintiffs' counsel did not indicate at the hearing on the motion for new trial and has made no asseration in the briefs on appeal that additional facts are available, we assume that plaintiffs have made a full disclosure of their case.

The issues presented are involved. Defendants have filed a four-page brief, citing one code section and two cases, each relating to well-known principles of law on the subject of nonsuits, and have challeged this court to determine whether plaintiffs have stated a "cause of action." They have given us no points and authorities, no statement of or argument on the basic issues before this court, thus placing upon the court the sole burden of analyzing plaintiffs' arguments. Defendants apparently fail to realize

their duties and responsibilities to the court. (*Garter* v. *Metzdorf Associates,* 217 Cal.App.2d 812, 817-818 [32 Cal.Rptr. 113]; 3 Witkin, Cal. Procedure (1954), Appeal § 154.) Although we have the authority to strike from the files such a defective brief and grant defendants time to file a new brief (Cal. Rules of Court, rule 18), we will undertake to determine all apparent issues.

### Collateral Estoppel

The trial court stated in its minute order granting the motion for nonsuit that "[p]laintiffs are estopped from again litigating the alleged unjustness or unfairness of the contract for the sale of the property, that issue having been decided adversly [*sic*] to them in Burrow Vs. Timmsen," 223 Cal.App.2d 283, and cited as authority *Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.,* 58 Cal.2d 601, 604, 606 [25 Cal.Rptr. 559, 375 P.2d 439].

*Burrow* v. *Timmsen* was an action for specific performance of the land sale contract involved herein, or in the alternative, damages. The action was brought by the purchasers against plaintiffs herein as sellers. None of the defendants herein was a party to the *Burrow* case. At trial the court sustained the objection of defendants to the introduction of evidence and granted their motion for judgment on the pleadings. Burrow appealed the judgment. The judgment for the Timmsens was reversed on appeal, retried and judgment for specific performance was entered in favor of Burrow. No appeal was taken from the judgment and it is now final.

*Teitelbaum, supra,* 58 Cal.2d 601, was a suit by a corporation to recover damages from insurers for losses incurred as the result of alleged robberies. The president of the plaintiff corporation had previously been convicted of conspiracy to commit grand theft, attempted grand theft, and the filing of a false and fraudulent insurance claim. It was conceded that the corporation was the *alter ego* of its president. The civil suit was for the same loss involved in the criminal proceedings, and the issue presented was identical to that previously adjudicated in the criminal action, namely, whether the alleged robbery occurred as plaintiff contended or whether it was staged by the president of the plaintiff corporation as defendant contended. In holding that plaintiff corporation was collaterally estopped from relitigating the issue, the court noted that the three requirements for application of the doctrine of collateral estoppel were present: (1) the issue decided in the prior adjudication was identical with the one presented in the pending action; (2) there has been a final judgment on the merits; and (3) the party against whom the plea was asserted was a party or in privity with a party to the prior adjudication. (58 Cal.2d at p. 604; see also 3 Witkin, Cal. Procedure (1954) Judgment, §§ 62-65.)

The issues determined by *Burrow* v. *Timmsen* were that as between the sellers (plaintiffs herein) and the purchaser (Burrow), the contract was certain, just and reasonable, the consideration was adequate, the assent of the parties was not obtained by misrepresentation, concealment, circumvention or unfair practices, the assent of the parties was not given under the influence of mistake, misapprehension or surprise; that there was no adequate remedy at law, and that the contract was capable of specific enforcement. (Civ. Code, §§ 3390, 3391; 4 Witkin, Summary of Cal. Law (1960) Equity, § 17 et seq.) As already noted, the brokers (defendants herein) were not parties to that lawsuit.

■ The issues and parties in the instant case are different from those in *Burrow* v. *Timmsen*. Here, there is no attack made on the validity and enforceabiltiy of the sales agreement; those were the issues determined by *Burrow* v. *Timmsen*. The issues presented by this action are whether the agents were guilty of withholding from their principals material facts, whether the agents assumed a position adverse to their principals, and if so, whether the principals suffered any damages as a proximate result thereof. Since the issues are not identical the doctrine of collateral estoppel is not applicable. (*Teitelbaum, supra,* 58 Cal.2d 601, 604.)

Notwithstanding this conclusion we note that even if the requirements for the application of the doctrine of collateral estoppel are present, "in cases where a grave injustice would otherwise result, there has been a tendency to depart from the general rule." (*United States Fire Ins. Co.* v. *Johansen,* 270 Cal.App.2d 824, 834 [76 Cal.Rptr. 174, 780] (hg. den.); see also Rest., Judgments, § 70.) To apply the doctrine of collateral estoppel in the instant case, even if all requirements were present, would countenance an injustice.

### Duties Owed Principal by Real Estate Broker

In determining this appeal we must accept as true the contents of the opening statement as to what plaintiffs expect to prove, and all legitimate inferences therefrom favorable to plaintiffs, We will briefly summarize the facts in this light.

■ The opening statement revealed that plaintiffs were unsophisticated in real estate transactions; that defendants were experienced real estate salesmen and brokers; that defendants inserted in the listing agreement a subordination provision and misadvised plaintiffs of its meaning; that defendants procured an offer that was financially unsound to plaintiffs' interests and misrepresented to plaintiffs that they were obligated to accept it; that when plaintiffs refused to accept the offer, defendants obtained plaintiffs' consent to a counteroffer that was also financially unsound to

their interests; that defendants then orally obtained the buyer's approval of the counteroffer and signed the buyer's name thereto; that defendants had no authority in writing to sign the buyer's name thereto and the agreement was therefore unenforceable under the statute of frauds (Civ. Code, § 1624); that defendants knew that plaintiffs did not want to consummate the transaction, knew that the contract was unenforceable, and did not disclose such fact to plaintiffs but instead threatened plaintiffs with the loss of $5,000 if plaintiffs failed to complete the sale; that defendants failed to take into account the interests of and obligations owing their principals but acted solely for their own selfish interests and the interests of the purchaser; and that as a proximate result of this misconduct plaintiffs suffered damages in attempting to avoid the sale.

■ " 'The relationship between a broker and his principal is fiduciary in nature, and imposes upon the broker the duty of acting in the highest good faith toward his principal. This duty of good faith precludes the broker from assuming a position adverse to that of his principal unless the principal consents. Moreover, it places upon the broker a legal obligation to disclose to his principal all the facts within his knowledge which are material to the matter in connection with which he is employed. (9 Cal.Jur.2d 199.) ■ [¶] When the acts of an agent have been questioned by his principal and the fiduciary relationship has been established, the burden is cast upon the agent to prove that he acted with the utmost good faith toward his principal [citations] and that he make a full disclosure prior to the transaction of all the facts relating to the transactions under attack. [Citations.]' (*Schwarting* v. *Artel,* 40 Cal.App.2d 433, 441 [105 P.2d 380].)" (*Bate* v. *Marsteller,* 175 Cal.App.2d 573, 580-581 [346 P.2d 903]; see also *Batson* v. *Strehlow,* 68 Cal.2d 662, 674-675 [68 Cal.Rptr. 589, 441 P.2d 101]; *Loughlin* v. *Idora Realty Co.,* 259 Cal.App.2d 619, 632 [66 Cal.Rptr. 747]; Rest. 2d Agency, § 399; 12 C.J.S., Brokers, § 47.)

■ "An agent who violates his duty to use reasonable care, skill and diligence is liable for any losses which his principal may sustain as the result of his negligence or breach of duty." (2 Cal.Jur.2d, Agency, § 113, p. 790; see also *Rianda* v. *San Benito Title Guar. Co.,* 35 Cal.2d 170, 173 [217 P.2d 25].)

■ "An agent is liable on the ground of negligence only for such damages as are the natural and proximate result of his negligence, and the measure of damages is the loss or injury actually sustained by the principal as a result of such negligence, and no further damages can be recovered. If there has been a breach of duty on the part of the agent, the principal is entitled to recover at least nominal damages; but if no loss or injury has

been sustained as the result of such negligence he is entitled only to nominal damages, and no substantial damages can be recovered." (3 C.J.S., Agency, § 162.)

We conclude under the rules of nonsuit heretofore stated that the facts set forth in the opening statement and the legitimate inferences to be drawn therefrom, are sufficient to support a judgment in plaintiffs' favor. We do not know at this time what evidence will be offered at trial by the respective parties, what findings of fact will be made and what conclusions of law will be drawn therefrom. Our ruling therefore must not be considered as indicating the ultimate conclusion to be reached by the trier of fact.

Judgment reversed.

Ford, P. J., and Allport, J., concurred.